**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Steven M. Skolnick, Esq.
S. Jason Teele, Esq.
Nicole Stefanelli, Esq.
Shirley Dai, Esq.
Anthony De Leo, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Kid Brands, Inc., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 14 – 22582 (    )<br><br>(Joint Administration Requested) |

**DECLARATION IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Glenn R. Langberg, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Restructuring Officer ("**CRO**") of Kid Brands, Inc. ("**Kid Brands**") and certain of its affiliates (collectively, the "**Debtors**," or the "**Company**").

2.      I am the Chief Executive Officer of GRL Capital Advisors, LLC ("**GRL**"), a financial advisory services firm that specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  I was formally appointed by the Company's Board of Directors (the "**Board**") to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Kid Brands, Inc. (5337); Kids Line, LLC (0448); Sassy, Inc. (9722); I&J Holdco, Inc. (1543); LaJobi, Inc. (1450); CoCaLo, Inc. (3844); and RB Trademark Holdco, LLC (0611).  The Debtors' corporate headquarters are located at 301 Route 17 North, 6th Floor, Rutherford, New Jersey 07070.

serve as the Company's CRO on June 18, 2014.  In the week prior to my appointment, I interviewed the Company's senior management on multiple occasions, met with the Company's legal and financial advisors, familiarized myself with the Company's books and records, and reviewed numerous documents maintained by the Company.  As such, I am familiar with the Company's business and financial affairs.  Together with the other members of the Company's senior management team, I am responsible for, among other things, devising and implementing strategies for the Company, including: (i) understanding and shaping the business and financial affairs of the Company; (ii) developing a cash flow analysis and assessing the current liquidity position of the Company; (iii) exploring and implementing various restructuring strategies for the Company; and (iv) serving as a principal contact with the Company's creditors and vendors.

   3. I submit this declaration (the "**Declaration**") in accordance with the *Guidelines Governing First Day Matters*, set forth in Appendix A to rule 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Bankruptcy Rules**") in support of the Debtors' voluntary petitions for relief under chapter 11 (the "**Chapter 11 Cases**") of title 11 of the United States Code (the "**Bankruptcy Code**") filed as of the date hereof (the "**Petition Date**") and the motions and applications filed concurrently herewith (collectively, the "**First Day Pleadings**").

   4. I have reviewed the First Day Pleadings or have otherwise had their contents explained to me by the Company's legal and/or financial advisors.  To the best of my knowledge, information, and belief formed after reasonable inquiry, I believe that approval of the relief requested in the First Day Pleadings is necessary to minimize disruption to the Debtors' business operations, permit a smooth and effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.  I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations, as described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

5.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' professional advisors, including Lowenstein Sandler LLP ("**Lowenstein Sandler**") and PricewaterhouseCoopers LLP ("**PwC**"), and/or my opinion based upon my experience, and/or my personal knowledge of the Debtors' financial records.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

6.      I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

7.      Based in Rutherford, New Jersey, the Company is a designer, importer, marketer, and distributor of infant and juvenile consumer products.  The Company's current operating subsidiaries consist of Kids Line, LLC ("**Kids Line**"), CoCaLo, Inc. ("**CoCaLo**" and, together with Kids Line, "**Soft Home**"), Sassy, Inc. ("**Sassy**"), and LaJobi, Inc. ("**LaJobi**"). Kids Line, CoCaLo, Sassy, and LaJobi are each direct or indirect wholly-owned subsidiaries of Kid Brands.  The Company designs, manufactures (through third parties), and markets products in a number of categories including: infant bedding and related nursery accessories and décor; nursery appliances; diaper bags; and bath/spa products (Kids Line® and CoCaLo®); nursery furniture and related products (LaJobi®); developmental toys and feeding products; and bath and baby care items with features that address the various stages of an infant's early years, including the Kokopax® line of baby gear products (Sassy®).  The Company's products are sold primarily to retailers in North America and Australia, including large, national retailers and independent retailers (including toy, specialty, food, drug, apparel and other retailers).

## PART I
## BACKGROUND

**A.    Company History, Organization, And Structure**

8.    Formerly known as Russ Berrie and Company, the Company was founded in 1963 as a maker of stuffed animals, other toys, and gifts.  The Company was founded by Russell Berrie, who started the business with only $500 and ran it out of a rented garage in Palisades Park, New Jersey.  The Company's first product to reach store shelves was the plush Fuzzy Wuzzies.  The Company exceeded one million dollars in annual sales by 1966.

9.    By the late 1970's, the Company opened a distribution center in California and expanded internationally.  The Company was recognized in 1982 by INC magazine as one of the top 500 fastest growing privately held companies in the United States.  The Company's shares began trading on the New York Stock Exchange in March 1984.

10.    The Company grew by acquiring several retail businesses.  In July 2002, the company acquired Sassy.  In December 2004, the Company acquired Kids Line.  In April 2008, the company acquired CoCaLo and LaJobi.

11.    In December 2008, the Company divested its gift business operations to The Russ Companies, Inc., which was previously known as the Encore Group.  In April 2011, the Russ Companies, Inc. filed a petition under chapter 7 of the Bankruptcy Code, and liquidated its business.

12.    On September 23, 2009, the Company announced shareholder approval of its proposal to change its name to Kid Brands, Inc., which the Company is known as today.  The name change underscored the Company's focus on global infant and juvenile consumer products.

13.    The Company's organizational chart is attached hereto as **Exhibit A**.

**B.    Current Businesses and Operations**

14.    Today, the Company is a designer, importer, and marketer of branded infant and juvenile consumer products.  Through the interplay of the Company's various

divisions, the Company is uniquely positioned to provide "everything but the baby" for a child's nursery.

15.     The Company's long-standing and legacy contingent liabilities are the primary drivers of the Company's current situation.  These liabilities resulted in excess cost, diversion of the attention of the Company's management, and stymied the Company's ability to attract more capital and funding.

16.     The Company's recent liquidity challenges stemmed from its inability to raise capital due to contingent liabilities, as discussed in more detail below, and operational issues, including lack of channel expansion and competition.  In response to these challenges, the Company has undergone changes in management and implemented initiatives to extend its sales reach to new customers and channels by hiring specialized sales associates in each business unit and increasing its e-commerce presence through the completion of business unit specific websites.  Additionally, the Company sought to grow its owned-brands, thereby reducing dependency on licensed revenue by establishing a design studio for LaJobi, Kids Line and CoCaLo, and differentiating its Soft Home products.  Finally, the Company implemented a variety of initiatives which are designed to reduce its product and operating costs.

17.     The Debtors also sought to enhance their operating efficiencies.  For example, on November 15, 2013, I understand that the Company announced that it signed an agreement with National Distribution Centers, L.P., a fully integrated supply chain solutions provider, to provide certain third party logistics services for the Company's warehousing and distribution operations.  I also understand that the Company announced plans to consolidate their five existing distribution facilities into one centralized location operated by National Distribution Centers, L.P. at its Chino, California campus, as a means of increasing the Company's overall efficiencies and achieving long-term benefits to its operating margin.

18.     On April 1, 2014, I understand that the Company announced that the Board, with the support of and in coordination with Salus (defined below), authorized the Company to identify and evaluate a broad range of strategic and financing alternatives aimed at

enhancing shareholder value.  These alternatives included addressing under-performing product lines, exploring strategic alliances, the sale or merger of the Company or one or more of its subsidiaries, and other possible transactions.  Pursuant to discussions with the Company's professionals, I understand that the Company believes that third parties have shown an interest in purchasing, at minimum, certain segments of the Company's business as going concerns.

19.     I understand that the Company, with the assistance of its advisors, also explored alternatives to strengthen its financial position, including restructuring the Company's current debt, engaging in a recapitalization, and other financing and strategic alternatives.

20.     As discussed in more detail below, on December 21, 2012, the Company refinanced its senior credit facility.  In connection with the execution of the Pre-Petition Credit Agreement (defined below), all outstanding obligations under the Company's previous credit agreement (approximately $55.3 million) were repaid.

C.      **The Debtors' Prepetition Debt Structure**

(i)      **Prepetition Credit Agreement**

21.     The Company is a party to that certain credit agreement (the "**Pre-Petition Credit Agreement**") dated as of December 21, 2012 with Salus Capital Partners, LLC ("**Salus**" or the "**Pre-Petition Agent**"), as Lender, Administrative Agent and Collateral Agent, and the other lenders from time to time party thereto (together with the Pre-Petition Agent, collectively, the "**Pre-Petition Lenders**") consisting of a $60 million revolving credit facility composed of: (i) a revolving $44 million tranche (the "**Pre-Petition Tranche A Revolver**"), with a $5 million sublimit for letters of credit; and (ii) a $16 million first-in last-out tranche (the "**Pre-Petition Tranche A-1 Revolver**").  Notwithstanding the foregoing, the Company was permitted (upon irrevocable notice to the Pre-Petition Agent) to increase the maximum commitment under the Pre-Petition Tranche A Revolver to $48 million and maximum commitment under the Pre-Petition Tranche A-1 Revolver to $17 million, provided that, among other things, all applicable

conditions to lending are satisfied.  The obligations of the Company under the Pre-Petition Credit Agreement are joint and several.

22.     In order to secure the Company's obligations under the Pre-Petition Credit Agreement, each of the Debtors have pledged 100% of the equity interests of its domestic subsidiaries (other than inactive subsidiaries), including a pledge of the capital stock of each Debtor (other than Kid Brands, Inc.), as well as 65% of the equity interests of specified foreign subsidiaries, to the Pre-Petition Agent, and granted security interests in substantially all of its personal property to the Pre-Petition Agent, pursuant to a Security Agreement, dated as of December 21, 2012.  As additional security for Sassy's obligations under the Pre-Petition Credit Agreement, Sassy granted a mortgage for the benefit of the Pre-Petition Agent and the Lenders on certain real property located at 2305 Breton Industrial Park Drive, S.E., Kentwood, Michigan; however, this mortgage was released by the Pre-Petition Agent upon the closing of the sale of such property in November 2013.

23.     The Pre-Petition Credit Agreement was amended on April 16, 2013, May 16, 2013, August 13, 2013, November 14, 2013, April 8, 2014, and May 14, 2014.

24.     Additional information with respect to the Pre-Petition Credit Agreement and the amendments thereto can be found in the Company's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2014, which was filed with the United States Securities and Exchange Commission (the "**SEC**") on May 22, 2014.

**(ii)      Trade Debt**

25.     As of the Petition Date, the Debtors have aggregate unsecured debts totaling approximately $54 million, which include amounts due and owing for merchandise, utilities, rent, professional fees, and employee-related expenses.  Of that amount, approximately $25.8 million constitutes trade vendor payables.

**D.**     **Litigation**

26.     The Company is party to various litigation and has been cooperating in an investigation by certain governmental agencies with respect to certain importation issues.  I understand that on August 19, 2011, the United States Attorney's Office for the District of New Jersey (the "**USAO**") contacted the Company requesting information, among other things, that the Company previously provided to U.S. Customs and Border Protection ("**U.S. Customs**") and the SEC in connection with U.S. Customs' "Focused Assessment" of LaJobi's import practices and procedures, which commenced in January 2011.  Since that time, I understand that the Company has been cooperating with the USAO on a voluntary basis.  In October 2013, I understand that discussions among the Company, its counsel and the USAO commenced concerning the potential resolution of this matter.  The Company has been seeking to negotiate a global resolution of these issues with the USAO and U.S. Customs.

27.     In addition, I understand that the Company has been subject to arbitration of a dispute with the former president of LaJobi, Lawrence Bivona ("**Mr. Bivona**"), in connection with Mr. Bivona's termination as a result of alleged antidumping violations and other import related issues.  The arbitration panel found in Mr. Bivona's favor with respect to Mr. Bivona's claims: (i) that the Company failed to pay Mr. Bivona his earnout when he sold LaJobi to the Company; (ii) that Mr. Bivona was entitled to indemnity and reasonable attorneys' fees; and (iii) that the Company breached Mr. Bivona's employment agreement by denying him certain benefits based upon an improper termination for "cause."  However, the arbitration panel also found that Mr. Bivona's recovery on these claims must be offset by damages awarded to the Company as a result of Mr. Bivona's breaches of fiduciary duty and his employment agreement. The arbitration panel retained jurisdiction to determine the damages owed on account of each of these claims pending an assessment of customs duties and/or penalties owed as a result of the LaJobi's import practices.

# PART II
## EVENTS LEADING TO THE DEBTORS' CHAPTER 11 CASES

28.    The commencement of these Chapter 11 Cases is the product of a confluence of factors.  First, beginning in 2013, I understand that the Company struggled to meet various financial and other covenants under the Pre-Petition Credit Agreement, resulting in numerous amendments to the agreement and waivers of default by its Pre-Petition Lenders.  The Company was also unable to meet the targets and projections set forth in its business plan.  On May 19, 2014, the Pre-Petition Lenders sent the Company a Notice of Default and Reservation of Rights Letter which, among other things, increased the interest rate for the outstanding loans under the Pre-Petition Credit Agreement to the applicable default interest rate.

29.    Second, on March 24, 2014, I understand that the New York Stock Exchange (the "**NYSE**") announced that trading of the Company's common stock would be suspended prior to the opening of trading on Monday, March 31, 2014 and that it would commence proceedings to delist the Company's common stock.  This action resulted from the NYSE's determination that the Company was not in compliance with the NYSE's continued listing standard because the Company's average global equity market capitalization was less than $15 million over a consecutive 30 trading-day period.  The Company did not appeal the delisting determination and is currently traded over-the-counter on the OTCQB Marketplace.

30.    Third, on April 15, 2014, the Company filed its 2013 Annual Report on Form 10-K with the SEC.  In the report issued by the Company's independent registered public accounting firm with respect to the Company's audited annual financial statements as of and for the year ended December 31, 2013, such firm included an explanatory paragraph regarding concerns about the Company's ability to continue to operate as a going concern.

31.    Fourth, as a result of the Company's insufficient capital resources to satisfy outstanding payment obligations owed to its vendors, several of vendors have demanded payment, are refusing to ship product, are requiring payment in advance of shipment or production and/or are otherwise threatening to take action against the Company, including

terminating their relationship with the Company and/or initiating legal proceedings for amounts owed.

32.    <u>Fifth</u>, due to outstanding subcontractor invoices, LaJobi failed to fulfill shipments of certain licensed goods to its customers, including Serta, Inc. ("**Serta**").  As a result, on April 25, 2014, Serta sent the Company a notice of breach with respect to the January 1, 2009 Trademark License Agreement entered into between Serta and LaJobi (the "**Trademark License Agreement**").  Serta subsequently terminated the Trademark License Agreement on May 27, 2014 and demanded outstanding minimum guaranteed royalties in the amount of approximately $140,000.

33.    <u>Sixth</u>, on May 14, 2014, the Company received a notice of amendment and material breach from The William Carter Company ("**Carter's**") with respect to the January 1, 2011 Amended and Restated License Agreement between Carter's and Sassy due to breaches arising from the cessation of certain shipping and distribution activities, and a late royalty payment (which was cured prior to receipt of the notice).  The Carter's notice also removes certain trademarks from the list of licensed trademarks under the agreement and certain accounts from the list of approved distribution channels.

34.    <u>Finally</u>, on May 27, 2014, citing the Company's deteriorating financial condition, Disney Consumer Products, Inc. terminated its license agreements with Soft Home and Sassy and demanded outstanding minimum guaranteed royalties in the amount of approximately $958,342.

35.    As a result of LaJobi's continued unprofitability over recent periods, and in connection with the Company's review of strategic and financing alternatives, the Company's Board authorized management to implement the suspension of LaJobi's wood furniture operations.  Management authorized the suspension as of May 22, 2014 and, in connection therewith, terminated on such date a related license agreement with Graco Children's Products, Inc. on mutually agreed terms, including an immediate waiver of LaJobi's obligation to pay additional guaranteed royalties.  The suspension is expected to be completed during the third

quarter of 2014, by which time the sell-down of remaining inventory under the Graco® license is expected to be complete.  LaJobi's warehouse and corporate office lease expires in July 2014 and will not be renewed.

36.     To address its liquidity issues, the Company sought to raise additional capital in banking and credit markets.  These efforts, however, have been hindered by the lack of finality and consequent uncertainty stemming from the pending USAO investigation and Bivona arbitration.  Without sufficient liquidity to meet its operating needs, the Company has been unable to meet its financial commitments as they become due.

37.     In response to the foregoing circumstances, the Debtors took the necessary step of commencing these Chapter 11 Cases to preserve the value of their assets for the benefit of the Debtors' estates, their creditors, and their other stakeholders, and to realize such value via a sale of the Company pursuant to section 363 of the Bankruptcy Code.

**PART III**
**FIRST DAY PLEADINGS**

38.     It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees, and customers.  Achieving this goal is likely to be particularly challenging while conducting a marketing campaign for the ultimate section 363 sale of the Company.  To that end, the Debtors filed the First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

39.     Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I am told by my advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable

harm." In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

      40.    I have reviewed each of the First Day Pleadings or had their contents explained to me. The facts stated therein and described below are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, and constitutes a critical element in successfully restructuring the Debtors' business. A brief summary of the relief sought in each of the First Day Pleadings is as follows:[2]

## A.    Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")

      41.    The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, Kid Brands, Inc. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

      42.    The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

      43.    Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience

---

[2]    This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein. To the extent that this Declaration is inconsistent with any provisions of any of the First Day Pleadings, the terms of the First Day Pleadings shall control. The Court is respectfully referred to the First Day Pleadings for the full details thereof.

without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

44.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

**B.      Application for Designation as Complex Chapter 11 Cases (the "Complex Chapter 11 Application")**

45.      By the Complex Chapter 11 Application, the Debtors request entry of an order designating the Debtors' Chapter 11 Cases as a complex chapter 11 case pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases*, and rule 6003-1 of the Local Bankruptcy Rules.

46.      I believe that the relief requested in the Complex Chapter 11 Application is in the best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in a streamlined fashion and allow the U.S. Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Complex Chapter 11 Application should be approved.

**C.      Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedules and Statements Motion")**

47.      The Debtors request entry of an order granting a 30-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") for a total of 44 days after the Petition Date.

The Debtors have hundreds of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems. Given the size, complexity, and geographic scope of the Debtors' operations, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the hundreds of employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date. The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 44-day deadline, if possible.

48.    I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

**D.    Debtors' Motion for Entry of an Order (I) Granting the Debtors an Extension of Time to File Their List of Creditors and (II) Authorizing the Debtors and/or Their Agent to (A) Prepare Consolidated Lists of Creditors and Interest Holders in Lieu of a Mailing Matrix, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (C) Mail Initial Notices (the "Creditor Matrix Motion")**

49.    Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of creditors for 45 days after the Petition Date. The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix. Additionally, the Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims. Finally, the Debtors request that Rust Omni, their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

50.     As previously stated, the Debtors have hundreds of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and scope of the Debtors' operations and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the hundreds of employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 45-day deadline, if possible.

51.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

**E.      Debtors' Motion For Entry of Interim And Final Orders (I) Authorizing the Debtors to Obtain Post-petition Financing on a Senior Secured And Superpriority Basis; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Scheduling Final Hearing Thereon; and (V) Granting Related Relief (the "<u>Financing Motion</u>")**

52.     Subject to Court approval, the Debtors have negotiated and reached an agreement to enter into the DIP Financing Facility (the "**<u>DIP Facility</u>**") that consists of a senior secured, superpriority post-petition credit facility in the aggregate amount of up to $49 million consisting of a (i) revolving $27 million tranche, and (ii) a revolving $22 million tranche.  Upon entry of the order approving the DIP Facility on an interim basis, the Debtors' existing obligations under the Pre-Petition Credit Agreement will be rolled-up and replaced by the DIP Facility.

53.     In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, merchandise purchases, capital expenditures, and other general corporate purposes.  An inability to use these funds during the Chapter 11 Cases

could cripple the Debtors' business operations. Indeed, the Debtors must use their cash to, among other things, continue operating their businesses in an orderly manner, maintain business relationships with vendors, service providers, suppliers, and customers, pay employees, and satisfy other working capital and operational needs - all of which are necessary to preserve and maintain the value of the Debtors' assets for the ultimate benefit of the Debtors' estates and their creditors. As set forth in more detail in the Financing Motion, access to the DIP Facility and use of Cash Collateral (as defined in the Financing Motion) are critical to the Debtors' ability to continue to operate through an orderly sale process and to permit the Debtors' to maximize the value of their assets for the benefit of the Debtors' stakeholders. After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Facility is the best financing option available to them.

54.    If the Financing Motion is granted, the DIP Facility will provide the Debtors the liquidity they need to continue to operate through a sale process pursuant to section 363 of the Bankruptcy Code. The ability to operate will enable the Debtors to conduct a competitive bidding process for the sale of their business as a going concern, rather than a piecemeal liquidation of their assets and, therefore, will maximize value for the Debtors' estates. In short, approving the DIP Facility will permit the Debtors to continue to operate their business, support the proposed sale process, and satisfy critical financing obligations during the Chapter 11 Cases.

55.    As set forth in the Financing Motion, the Debtors' execution of the DIP Facility agreements is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases. Based on such analysis, the Debtors determined that post-petition financing was immediately necessary to support their operational and restructuring activities. Accordingly, the Debtors began negotiating with the Pre-Petition Secured Parties regarding the terms of a post-petition DIP Facility.

56.    After a series of good faith, arms'-length negotiations, the Debtors and the DIP Lenders entered into the DIP Credit Agreement (as defined in the Financing Motion), whereby the parties reached agreement on the material terms of the DIP Facility.  Based on the advice of counsel and other professionals, the Debtors have determined in their sound business judgment that the DIP Credit Agreement provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  Without post-petition financing, the Debtors would be unable to continue operations without interruption and pursue an orderly sale of their assets under section 363 of the Bankruptcy Code.

57.    The Debtors' advisors approached potential participants in a debtor-in-possession financing arrangement.   The Debtors' advisors have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.  Based on such efforts, the Debtors and their advisors determined that the Prepetition Secured Parties were willing to provide post-petition financing and consent to the use of Cash Collateral on more favorable terms than any other reasonably available alternative.

58.    Moreover, as noted, virtually all of the Debtors' assets are encumbered by pre-petition liens.  Thus, even if alternative debtor-in-possession financing was available on more favorable terms and conditions, and could be consummated in a timely fashion, such financing would result in a protracted priming contest between the Pre-Petition Secured Parties, the results of which could not be predicted with certainty.  Any protracted litigation would jeopardize the Chapter 11 Cases from the outset.  Although the DIP Lender will be granted priming liens as set forth in the proposed DIP Orders (as defined in the Financing Motion), the DIP Lender will be priming itself.

59.    The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to preserve and maintain the value of the Debtors' assets for the benefit of their estates and creditors.  As discussed in detail in the Financing Motion, the Debtors require immediate access to Cash Collateral in order to meet their liquidity needs in connection with the Chapter 11 Cases.  While the Interim DIP Order (as

defined in the Financing Motion) approves the Debtors' authorization to enter into a DIP Credit Agreement, the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral.  The Prepetition Secured Lender is unwilling to consent to the Debtors' use of Cash Collateral absent the Debtors' entry into the DIP Facility in its entirety.

60.    For the foregoing reasons, I believe that the terms and conditions of the DIP Facility (including the fees and charges paid thereunder) and the use of Cash Collateral are fair, reasonable, and negotiated in good faith and at arms'-length after extensive efforts to obtain the most advantageous post-petition financing.  The Debtors and their advisors have determined, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances.  I further believe that the relief requested in the Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable to the Debtors to operate their businesses in chapter 11 without disruption.  On behalf of the Debtors, I respectfully submit that the Court should (a) approve immediate access to the DIP Facility and use of Cash Collateral on an interim basis pursuant to the Interim DIP Order, and (b) enter the Final DIP Order at the Final Hearing (as those terms are defined in the Financing Motion).

**F.     Debtors' Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Pay Pre-Petition Wages, Salaries and Related Obligations and Taxes, and (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations (the "<u>Wages</u> <u>Motion</u>")**

61.    By the Wages Motion, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to pay certain wages, salaries, benefits, taxes, and other expenses related to the workforce employed in the Debtors' business (collectively, the "**<u>Employee</u> <u>Obligations</u>**"), and (ii) directing all banks to honor and pay (to the extent that sufficient funds are available in the Debtors' accounts) all checks and transfers for payment of pre-petition employee obligations.

62.    In the ordinary course of their business operations, the Debtors employ approximately 194 individuals (collectively, the "**<u>Employees</u>**") in their business divisions and

corporate headquarters, all of whom are full-time employees.    Of these employees, approximately 25 are members of a union and subject to a collective bargaining agreement (the "**Union Employees**").   The wages and salaries owed to the Employees as of the Petition Date total approximately $451,349.

63.    The Debtors also utilize the services of approximately 54 independent contractors (the "**Independent Contractors**") as sales representatives, consultants, and private security officers.   The sales representatives are paid on commission, while the consultants and private security officers are paid either a fixed fee or an hourly wage.    The salaries and commissions owed to the Independent Contractors as of the Petition Date total approximately $131,034.

64.    The Debtors seek authority to pay accrued pre-petition Employee Obligations in the ordinary course of business in the following approximate amounts:

| Category | Estimated Accrued Pre-Petition Amount |
|---|---|
| Employee Wages and Salaries | $451,349[3] |
| Bonuses, Supervision Pay, Other Incentive Compensation | $0 |
| Independent Contractors | $131,034 |
| Employee Payroll Deductions (401(k), Garnishments, Health Premiums, FSA Contributions, etc.) | $27,442 |
| Payroll Taxes and Tax Withholding | $147,765 |
| Health and Welfare Benefits | $255,000 |
| 401(k) Plan Match | $0 |
| Vacation Benefits | $169,000 |
| Worker's Compensation | $0 |
| Reimbursable Business Expenses | $10,000 |
| Business Expense Card Charges | $3,500 |

---

[3]    The Debtors do not believe that any Employee or Independent Contractor is owed more than the $12,475 priority claim amount established pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code.   Nevertheless, to the extent that any such claim exists, the Employee or Independent Contractor will only be paid up to the maximum statutory priority claim amount.

65.     The continued, uninterrupted service of the Employees and Independent Contractors is essential to the Debtors' efforts to maximize the value of their estates.  Any delay in paying outstanding wages, salaries, and other compensation due to the Employees and Independent Contractors as of the Petition Date or the failure by the Debtors to continue their pre-petition practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtors' relationship with their Employees and Independent Contractors, impair morale at this critical juncture, and disrupt the Debtors' business operations, all of which would irreparably harm the value of the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**G.      Debtors' Motion for an Order (I) Authorizing the Debtors to Continue and Maintain their Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day Objection Period and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")**

66.     The Debtors request entry of an order (i) authorizing the Debtors to maintain their existing bank accounts and cash management system and continue to use existing business forms and records, (ii) modifying the investment guidelines set forth in section 345 of the Bankruptcy Code, (iii) providing the United States Trustee with sixty days to object to the relief requested in the Cash Management Motion, and (iv) granting related relief.  In connection with this relief, the Debtors request a waiver of certain of the operating guidelines established by the United States Trustee for the District of New Jersey (the "<u>U.S. Trustee</u>") that require the Debtors to close all of their pre-petition bank accounts, open new accounts designated as debtor-in-possession accounts and obtain new business forms and statements.

67.     In the ordinary course of their operations, the Debtors maintain a cash management system to receive and disburse funds.  Receipts from the Debtors' customers are made via lockbox deposits, electronic fund transfers and wires, or credit card transactions.  With the exception of Kid Brands, Inc., the receipts are held in the depository accounts (the

"**Depository Accounts**") of each Debtor.[4]  Funds from the Depository Accounts are swept daily directly into the Debtors' main control concentration account maintained at JPMorgan Chase (the "**Control Concentration Account**").

68.     Funds from the Control Concentration Account are in turn swept daily directly into the pre-petition secured lender's account at Sovereign Bank to repay the Debtors' line of credit.  Subsequently, new borrowings under the line of credit are transferred into the Debtors' main disbursement account at JPMorgan Chase (the "**Disbursement Account**").  From the Disbursement Account, funds are transferred to the disbursement accounts for each Debtor, which in turn applies the funds to their operations and, in certain instances, to fund certain expenses of the Debtors' foreign subsidiaries.

69.     If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements.  In fact, the Debtors would need to open dozens of new bank accounts.  Thus, the Debtors' treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases.  The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow.  Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.  Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new

---

[4]     Kid Brands, Inc. does not have a Depository Account.  Instead, receipts are deposited into its operating account and manually swept into the pre-petition secured lender's account at Sovereign Bank as needed.

signatory cards and depository agreements, and create an entirely new manual system for issuing

checks and paying post-petition obligations.

70.     I believe the Debtors' continued use of the Cash Management System will

greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding

administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts,

and providing important internal controls.  I believe that parties-in-interest will not be harmed by

the Debtors' maintenance of the existing Cash Management System, including their Bank

Accounts, because the Debtors have implemented appropriate mechanisms to ensure that

unauthorized payments will not be made on account of obligations incurred before the Petition

Date.  Specifically, the Debtors and their advisors have implemented internal protocols that

prohibit payments on account of pre-petition debts without the prior approval of appropriate

managers.  In light of such protective measures, the Debtors submit that maintaining the Cash

Management System is in the best interests of their estates and creditors.

71.     Given the substantial economic scale and geographic reach of the Debtors'

business operations, I believe that any disruption to the Cash Management System could impede

a successful restructuring of the Debtors' businesses.  Accordingly, I believe that the relief

requested in the Cash Management Motion is in the best interests of the Debtors' estates and will

enable the Debtors to operate their businesses in chapter 11 without disruption.  Therefore, on

behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

**H.      Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility
Companies From Discontinuing, Altering or Refusing Service on Account of Pre-
Petition Invoices, (II) Approving the Debtors' Proposed Form of Adequate
Assurance of Future Payment and (III) Establishing Procedures for Resolving
Requests for Additional Adequate Assurance (the "Utilities Motion")**

72.     By the Utilities Motion, the Debtors seek entry of interim and final orders:

(i) prohibiting the Utility Companies (defined below) from discontinuing, altering or refusing

service to the Debtors on account of pre-petition invoices, (ii) approving the Debtors' proposed

form of adequate assurance of post-petition payment within the meaning of section 366 of the

Bankruptcy Code and determining that the Utility Companies have been provided with adequate assurance and (iii) establishing procedures for resolving requests for additional or different adequate assurance of payment.  The Debtors further request that the Court schedule a final hearing to consider entry of a final order granting the relief requested in the Utilities Motion (the "**Final Hearing**").

73.     In connection with the operation of their facilities, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, electricity, gas, internet, telephone and similar utility products and services (collectively, the "**Utility Services**") from various utility companies (the "**Utility Companies**").

74.     For the prior twelve (12) months ended April 30, 2014, the Debtors spent approximately $730,752 annually for various Utility Services, with an average monthly cost of approximately $60,896.

75.     Given the nature of the Debtors' business, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' Chapter 11 efforts.  Indeed, any disruption to the Debtors' service locations by virtue of the cessation of utility services by the Utility Companies could bring the Debtors' operations to a grinding halt.  Should one or more of the Utility Companies refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted.  Such an interruption would severely damage customer relationships, revenues and profits, and would adversely affect the Debtors' Chapter 11 efforts, to the detriment of their estates, creditors, and employees.  It is therefore critical that the Utility Services provided to the Debtors continue uninterrupted.

76.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

I.     **Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "Tax Motion")**

77.     By the Tax Motion, the Debtors request entry of an order authorizing them to pay taxes and governmental fees (including sales, use, income, margin, business activity, personal property, franchise, and other miscellaneous taxes and business license, permit, annual report, and other miscellaneous fees) that accrued or arose in the ordinary course of business before the Petition Date.  The Debtors estimate that the following approximate amounts of taxes and fees in each category, totaling approximately $62,500 in the aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
|---|---|
| Sales Taxes | $1,000 |
| Use Taxes | $7,000 |
| State Property Taxes | $42,000 |
| Privilege Taxes | $5,000 |
| Personal Property Taxes | $2,500 |
| Business License/Permit Fees, Annual Report Fees, Franchise Taxes, and Other Miscellaneous Taxes and Fees | $5,000 |

78.     The Debtors' successful Chapter 11 process will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors.  Given that the Debtors operate in numerous facilities and locations, there are a significant number of Taxing Authorities with which the Debtors interact.  If any of the Taxing Authorities attempt to exercise certain remedies against the Debtors with respect to unpaid Taxes and Fees, it could have the devastating effect of distracting the attention of the Debtors' management and professionals away from the Debtors' successful Chapter 11 process.  Any regulatory dispute or delinquency that could impact the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, which, in turn, could significantly reduce the value of the Debtors' assets.  The Debtors' failure to pay the Taxes and Fees could adversely impact the Debtors' business

operations because, among other things: (i) the Taxing Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their business, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Taxing Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estate; and (iii) certain directors and officers might be subject to personal liability – even if a failure to pay such Taxes and Fees was not a result of malfeasance on their part – which would undoubtedly distract those key employees from their duties related to the Debtors' restructuring.

79.     The relief the Debtors seek in the Tax Motion will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, to prevent immediate, irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

**J.      Debtors' Motion for an Order Authorizing the Debtors to (I) Pay Installments Under Pre-Petition Insurance Premium Finance Arrangements, (II) Continue Pre-Petition Insurance Programs and (III) Pay All Pre-Petition Obligations in Respect Thereof ("Insurance Motion")**

80.     By the Insurance Motion, the Debtors seek authority to continue performing their obligations under all the Insurance Programs, pay the necessary premiums that may be due before or after the Petition Date under the Insurance Policies, including payments pursuant to the Premium Finance Agreements (as defined below), and pay any amounts outstanding to Administrators in the ordinary course of business (collectively, the "**Insurance Obligations**").

81.     In connection with the day-to-day operations of their business, the Debtors maintain various insurance programs (the "**Insurance Programs**") and related insurance policies as set forth in greater detail in the Insurance Motion (the "**Insurance Policies**"), through several different insurance providers (the "**Insurance Providers**").  The Debtors have numerous Insurance Policies covering a variety of matters such as earthquakes (California only), ocean

marine, general liability, umbrella liability, workers' compensation, automobile, executive risk, directors' and officers' liability, professional liability, surety bond, and property.

82.     The Debtors seek authority to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are either (i) paid in installments to the carrier over the term of the policy; (ii) pre-paid at a policy's inception or renewal; or (iii) financed through a premium financing company.  As of the Petition Date, the Debtors are current on all of their payments to Insurance Providers.  The Debtors pay approximately $151,000 in monthly insurance premiums, as of the Petition Date.

83.     In addition, certain of the Debtors' Insurance Policies are financed through Commercial Premium Finance Agreements (the "**Premium Finance Agreements**") with First Insurance Funding and Premium Assignment Corporation.   The Debtors currently have outstanding payments pursuant to the Premium Finance Agreements in the approximate amount of $119,398.

84.     The Debtors have compelling business reasons for seeking to maintain their Insurance Policies and to pay all necessary premiums thereunder.  Insurance coverage provided under the Debtors' Insurance Policies is essential for preserving the value of the Debtors' businesses, properties, and assets, and, in many cases, such coverage may be required by various regulations, laws, and contracts that govern the Debtors' businesses.  Such coverage is also required by the U.S. Trustee guidelines.  If the Debtors do not continue to perform their obligations under the Insurance Policies, their coverage under the Insurance Policies could be impaired.  Disruption of their insurance coverage would expose the Debtors to serious risks, including (i) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (ii) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (iii) the possible inability to obtain similar types of insurance coverage; and (iv) the possible incurrence of higher costs for re-

establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences would cause serious and irreparable harm to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss, at a minimum. To avoid those consequences, the relief requested herein should be granted.

85.     In light of the importance of maintaining insurance coverage, the Debtors submit it is in the best interests of the Debtors' estates to maintain all of their Insurance Policies and to pay all premium payments and related costs.

Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Insurance Programs and any attendant harm to the Debtors' businesses that such disruption would cause.

**K.     Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Claims of Certain Critical Vendors (the "Critical Vendor Motion")**

86.     By the Critical Vendor Motion, the Debtors seek authority to pay the prepetition claims (the "**Critical Vendor Claims**") of certain parties the Debtors have identified as critical business relationships and/or suppliers of goods and services (the "**Critical Vendors**"),[5] the loss of which could immediately and irreparably harm the Debtors' businesses, shrink their market share, reduce their enterprise value and/or significantly impair the value of their assets.

87.     There are approximately 10 Critical Vendors and the pre-petition trade amount owed to them represents approximately 22% of the Debtors' total pre-petition trade obligations of approximately $25.8 million. Moreover, the Debtors estimate that, as of the Petition Date, they owe the Critical Vendors approximately $427,662 in the aggregate for goods received by the Debtors within the 20 days of the Petition Date (approximately 7% of the pre-

---

[5]     The Debtors will provide the list of Critical Vendors to their post-petition secured lender, the United States Trustee, and any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases, provided that such information is treated as confidential.

petition Critical Vendor claims), which amounts will be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

88.     The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as, or more, favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the twelve (12) months prior to the Petition Date (the "**Customary Trade Terms**"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.  The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

89.     I believe that the continued availability of trade credit in amounts and on terms consistent with those the Debtors enjoyed pre-petition is critical to the Debtors because it allows the Debtors to preserve working capital.  The retention or reinstatement of Customary Trade Terms will therefore enable the Debtors to maximize the value of their businesses. Conversely, a deterioration of post-petition trade credit available to the Debtors and a disruption or cancellation of deliveries of merchandise – many of which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors post-petition (which funding may not be readily available), and ultimately impede the Debtors' ability to sell their businesses as a going concern, thereby maximizing distributions to the Debtors' creditors and other stakeholders.  Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Critical Vendor Motion be granted.

**L.     Debtors' Motion for Entry of an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Claims of Certain Foreign Vendors (the "Foreign Vendors Motion")**

90.     By the Foreign Vendors Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay pre-petition claims (the "**Foreign Vendor Claims**") of certain foreign vendors (the "**Foreign Vendors**"), who are not subject to the

jurisdiction of the United States, in their discretion, and in the ordinary course of business, up to $1.5 million.

91.     The Debtors also request authority to direct each of the financial institutions at which the Debtors maintain their accounts relating to the pre-petition or post-petition obligations are authorized to honor checks presented for payment and all fund transfer requests made by the Debtors related to such obligations to the extent that sufficient funds are on deposit in such accounts and to issue post-petition checks or to make additional electronic payment requests with respect to payment of a Foreign Vendor Claim in the event pre-petition checks or electronic payment requests are dishonored or rejected.

92.     The Debtors have determined that the Foreign Vendors may take drastic action if the Foreign Vendor Claims are not paid. Indeed, non-U.S. entities have occasionally asserted that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code. Although the Debtors would vigorously dispute any such contention, the Foreign Vendors could stop shipping goods or providing services to the Debtors on a timely basis, and foreign governmental and other entities may take action to seize assets of the Debtors or refuse to release shipments of goods to the Debtors, on the basis of such assertions.  Irrespective of the accuracy of any Foreign Vendor's belief that the automatic stay does not apply to these actions, the consequences of such actions would be severe and irreparable.  Simply put, absent the goods and services of the Foreign Vendors, the operations of the Debtors would be thrown into disarray. Therefore, even if the Foreign Vendors' legal arguments are completely without merit, it is unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Foreign Vendors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to the Debtors' businesses – particularly since injunctive relief may not be available in all jurisdictions. Indeed, the impact on the Debtors' businesses would be disproportionate to the amount of the Foreign Vendor Claims paid.

93.     Not only would such an eventuality drastically affect the Debtors' revenues, cash flows, and profitability, but it could also potentially lead to the Debtors' customers asserting sizeable damage claims against the Debtors' estates to the detriment of the Debtors' other creditors.  The Debtors assert that the amount of the Foreign Vendor Claims pales in comparison to the likely damage to the Debtors' businesses should the relief requested herein not be granted.  Not only would the Debtors' other creditors not be harmed by payment of the Foreign Vendor Claims, but such creditors would also in fact benefit from this Courts' empowering the Debtor to make payments to the Foreign Vendors so as to achieve a smooth transition into bankruptcy with minimal disruption to its operations.  In light of these factors, payment of the Foreign Vendor Claims is plainly in the best interests of the Debtors' estates and their creditors. Accordingly, even if payment of the Foreign Vendor Claims is deemed to be outside the ordinary course of business, there is a sufficient business justification for such payments.  Thus, the Debtors respectfully submit that this Court should grant the requested relief under section 363 of the Bankruptcy Code.

94.     Payment of the Foreign Vendor Claims will allow the Debtors to continue to receive goods from, as well as eliminate the risk of the potential collection attempts by, the Foreign Vendors.  I therefore believe that, given the circumstances and practical realities, it is in the best interests of its estate and creditors to have the authority to satisfy the Foreign Vendor Claims.  Accordingly, the Debtors request the Court's authority to pay the Foreign Vendor Claims because payment of such claims is necessary to preserve the value of the Debtors' assets.

**M.     Debtors' Motion for an Order Authorizing the Debtors to (A) Retain GRL Capital Advisors, LLC to Provide the Debtors a Chief Restructuring Officer, and (B) To Appoint the Chief Restructuring Officer Effective as of the Petition Date (the "GRL Motion")**

95.     By the GRL Motion, the Debtors seek to retain GRL as the Debtors Chief Restructuring Officer in these Chapter 11 Cases.  In consideration of the exigencies of the circumstances leading to the commencement of these cases and the myriad tasks that the Debtors must perform to achieve a successful restructuring of their businesses, the Debtors have

determined that the services of experienced restructuring managers will substantially enhance their restructuring efforts and maximize the value of their estates. GRL and the CRO are well-qualified to act on the Debtors' behalf given their extensive knowledge and expertise regarding chapter 11 proceedings. Accordingly, I believe that GRL is well-qualified and able to represent the Debtors in these Chapter 11 Cases, and its experience will help the Debtors navigate through bankruptcy in an efficient manner for the benefit of the Debtors' estates and their creditors.

**N.     Debtors' Applications Authorizing the Retention of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent and Administrative Agent to the Debtors Effective as of the Petition Date**

96.     By separate applications (the "**Rust Omni Applications**"), the Debtors seek to retain Rust Consulting/Omni Bankruptcy ("**Rust Omni**") as claims and noticing agent and administrative agent to the Debtors in these Chapter 11 Cases. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be hundreds of entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent/administrative agent is both necessary and in the best interests of the Debtors' estates and their creditors. By appointing Rust Omni as the claims and noticing agent and administrative agent in these Chapter 11 Cases, the distribution of notices, processing of claims, and general administration of the Chapter 11 Cases will be expedited, and the Clerk's Office will be relieved of the burden of processing what may be an overwhelming number of claims and administering a particularly complex bankruptcy case.

**O.     Debtors' Application for Entry of an Order Authorizing the Retention of 360 Merchant Solutions, LLC as Sales Agent to the Debtors Effective as of the Petition Date (the "360 Merchant Application")**

97.     By the 360 Merchant Application, the Debtors seek to retain 360 Merchant Solutions, LLC ("**360 Merchant**") as sales agent to the Debtors in these Chapter 11 Cases. The Debtors selected 360 Merchant to serve as their sales agent because of 360 Merchant's significant experience in strategic marketing and sales of distressed assets as they relate to

debtors' and creditors' rights, insolvency, debt restructuring, and corporate reorganization, as well as 360 Merchant's involvement in numerous other proceedings under Chapter 11 of the Bankruptcy Code before this Court.  Accordingly, and as more fully set forth in the Miller Declaration, I believe that 360 Merchant is well-qualified and able to represent them in these Chapter 11 Cases, and their services will operate to maximize the value of the Debtors' assets via a sale of the Debtors' businesses pursuant to section 363 of the Bankruptcy Code.

**P.     <u>Conclusion</u>**

98.     The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Cases on the Debtors and result in maximum creditor recoveries.  I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

99.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

**KID BRANDS, INC.,** *et al.*
*Chapter 11 Debtors and Debtors-in-Possession*

By: _____
    Glenn R. Langberg
    Chief Restructuring Officer
    Kid Brands, Inc.

Dated:  June 18, 2014

# EXHIBIT A

# Kid Brands, Inc. and Subsidiaries

