**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Steven M. Skolnick, Esq.
S. Jason Teele, Esq.
Nicole Stefanelli, Esq.
Shirley Dai, Esq.
Anthony De Leo, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Kid Brands, Inc., *et al.*,[1]<br><br>             Debtors. | Chapter 11<br><br>Case No. 14 – 22582 (    )<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
FINANCING ON A SENIOR SECURED AND SUPERPRIORITY BASIS;
(II) AUTHORIZING THE USE OF CASH COLLATERAL; (III) GRANTING
ADEQUATE PROTECTION; (IV) SCHEDULING FINAL HEARING THEREON;
AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the

"**Debtors**"), by and through their proposed counsel, submit this motion (the "**Motion**") for entry

of an interim order (the "**Interim DIP Order**"), substantially in the form attached hereto as

**Exhibit 1**, and after a final hearing on the Motion (the "**Final Hearing**"), a final order (the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Kid Brands, Inc. (5337); Kids Line, LLC (0448); Sassy, Inc. (9722); I&J Holdco, Inc. (1543); LaJobi, Inc. (1450); CoCaLo, Inc. (3844); and RB Trademark Holdco, LLC (0611). The Debtors' corporate headquarters are located at 301 Route 17 North, 6th Floor, Rutherford, New Jersey 07070.

"**Final DIP Order**," and together with the Interim DIP Order, collectively, the "**DIP Orders**")
(i) authorizing the Debtors to obtain post-petition financing (the "**DIP Facility**") on a senior
secured and superpriority basis in accordance with the terms of a post-petition debtor-in-
possession financing agreement (the "**DIP Credit Agreement**") between the Debtors and Salus
Capital Partners, LLC ("**Salus**"), as administrative and collateral agent (in such capacity, the
"**DIP Agent**") and the other lenders from time to time party to the DIP Credit Agreement
(collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"),
(ii) authorizing the Debtors to use Cash Collateral (as defined herein), (iii) granting adequate
protection to the Pre-Petition Secured Lender with respect to, *inter alia*, such use of Cash
Collateral and any diminution in the value of the Pre-Petition Secured Parties' interests in the
Pre-Petition Collateral (as defined herein), including Cash Collateral, (iv) prescribing the form
and manner of notice of and setting the time for the Final Hearing, and (v) granting certain
related relief.  In support of this Motion, the Debtors submit the *Declaration in Support of
Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), filed
contemporaneously herewith, and respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157
and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* dated as
of September 18, 2012 (Simandle, C.J.).  Venue is proper in this district pursuant to 28 U.S.C. §§
1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory bases for the relief requested herein are sections 105(a),
361, 362, 363, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"),
Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the
"**Bankruptcy Rules**"), and the applicable Local Bankruptcy Rules for the United States
Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

### GENERAL BACKGROUND

3.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

4.    The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no trustee or examiner has been requested in the Chapter 11 Cases and no committee has been appointed in the Chapter 11 Cases.

5.    Additional background facts surrounding the commencement of these Chapter 11 Cases are more fully described in the First Day Declaration.

### RELEVANT BACKGROUND

**A.    The Pre-Petition Capital Structure**

6.    As of the Petition Date, the Debtors have outstanding secured debt to Salus, as a lender (in such capacity, the "**Pre-Petition Agent**") under that certain *Credit Agreement* dated as of December 21, 2012 (as amended from time to time, the "**Pre-Petition Credit Agreement**") by and between Kid Brands, Inc. ("**Kid Brands**"), as the lead borrower, and certain domestic subsidiaries consisting of Kids Line, LLC, Sassy, Inc., LaJobi, Inc., CoCaLo, Inc., I&J Holdco, Inc., and RB Trademark Holdco, LLC (collectively with Kid Brands, the "**Borrowers**"), and the Pre-Petition Agent as administrative agent, and collateral agent for the other lender parties thereto (collectively, the Pre-Petition Agent and such lenders are referred to herein as the "**Pre-Petition Secured Parties**").

7.    The Pre-Petition Credit Agreement provides for a revolving credit facility in the aggregate maximum amount of $60 million (the "**Pre-Petition Revolving Facility**"), composed of a (i) revolving $44 million tranche (the "**Pre-Petition Tranche A Revolver**"), with a $5 million sublimit for letters of credit, and (ii) a $16 million first-in-last-out tranche (the "**Pre-Petition Tranche A-1 Revolver**").  Upon the satisfaction of certain conditions, the Pre-Petition Credit Agreement permitted the Borrowers to increase the maximum commitment

under the Pre-Petition Tranche A Revolver to $48 million, and the maximum commitment under the Pre-Petition Tranche A-1 Revolver to $17 million.

### (i)      First Amendment To The Pre-Petition Credit Agreement

8.      On April 16, 2013, the Borrowers and the Pre-Petition Agent entered into the *First Amendment To Credit Agreement* ("**Amendment No. 1**") to amend the definition of "Adjusted EBITDA," as that term is used in the Pre-Petition Credit Agreement, for the purpose of determining the Borrowers' compliance with specified financial covenants.

### (ii)     Second Amendment To The Pre-Petition Credit Agreement

9.      On May 16, 2013, the Borrowers and the Pre-Petition Agent entered into the *Second Amendment To Credit Agreement* ("**Amendment No. 2**"), which was retroactively effective as of April 1, 2013, to further amend the definition of "Adjusted EBITDA," as that term is used in the Pre-Petition Credit Agreement, provide that Adjusted EBITDA would be tested on a quarterly rather than monthly basis absent certain triggers, and lower the minimum Adjusted EBITDA requirement.

### (iii)    Letter Agreement

10.     On August 13, 2013, the Borrowers and the Pre-Petition Agent entered into a letter agreement (the "**Letter Agreement**") to, among other things, eliminate the requirement that the Borrowers comply with the Adjusted EBITDA covenant under the Pre-Petition Credit Agreement for a specified testing period.

### (iv)     Third Amendment To The Pre-Petition Credit Agreement

11.     On November 14, 2013, the Borrowers and the Pre-Petition Agent entered into the *Third Amendment To Credit Agreement And Limited Waiver* ("**Amendment No. 3**") to waive existing covenant defaults, replace certain financial covenants, require delivery of a monthly gross sales report, and accelerate the delivery date of a 2014 business plan.

### (v)      Agreement Regarding Commitments

12.     On December 13, 2013, the Borrowers and Pre-Petition Secured Parties entered into an *Agreement Regarding Commitments* (the "**Commitment Reduction**") to reduce

the maximum commitment under the Pre-Petition Tranche A Revolver to $44 million and the maximum commitment under the Pre-Petition Tranche A-1 Revolver to $16 million.  Upon the satisfaction of certain conditions, the Commitment Reduction permitted the Borrowers to increase the maximum commitment under the Pre-Petition Tranche A Revolver to $48 million and the maximum commitment Pre-Petition Tranche A-1 Revolver to $17 million.

(vi)     **Fourth Amendment To The Pre-Petition Credit Agreement**

13.     On April 8, 2014, the Borrowers and the Pre-Petition Agent entered into the *Waiver And Fourth Amendment To Credit Agreement* ("**Amendment No. 4**") to waive existing events of default, suspend compliance with certain financial covenants, reduce the availability block from $4 million to $3.5 million for a specified period, increase the amount of eligible inventory used to calculate availability under the Pre-Petition Credit Agreement for a limited period, impose a new monthly collateral coverage ratio, increase the interest rate margins for both the Pre-Petition Tranche A Revolver and the Pre-Petition Tranche A-1 Revolver by 2% per annum, and grant the Pre-Petition Agent observation and participation rights (in a non-voting capacity) on the Kid Brands' board of directors.

(vii)     **Waiver And Fifth Amendment To The Pre-Petition Credit Agreement**

14.     On May 14, 2014, the Borrowers and the Pre-Petition Agent entered into the *Waiver And Fifth Amendment To Credit Agreement* ("**Amendment No. 5**," together with the Pre-Petition Credit Agreement, Amendment No. 1, Amendment No. 2, the Letter Agreement, Amendment No. 3, the Commitment Reduction, and Amendment No. 4, the "**Pre-Petition Credit Documents**") to waive any failures of conditions to lending and existing events of default, increase the amount of eligible receivables under the Pre-Petition Tranche A Revolver borrowing base, and reduce the availability block from $3.5 million to $2.768 million for a specified period.

15.     As of the Petition Date, there is approximately $44,437,238.46 of outstanding principal amount owing by the Debtors under the Pre-Petition Revolving Facility (collectively, together with any amounts paid, incurred or accrued but unpaid prior to the

Petition Date in accordance with the Pre-Petition Credit Documents, including all "Indebtedness" as described in the Pre-Petition Credit Documents, the "**Pre-Petition Secured Obligations**").  As more fully set forth in the Pre-Petition Credit Documents, except for certain permitted encumbrances (the "**Permitted Liens**"), prior to the Petition Date, the Debtors granted first-priority security interests in and liens on (collectively, the "**Pre-Petition Liens**") substantially all personal and real property of the Debtors, including accounts, inventory, equipment, and general intangibles (collectively, the "**Pre-Petition Collateral**") to the Pre-Petition Agent on behalf of the Pre-Petition Secured Parties to secure repayment of the Pre-Petition Secured Obligations.  The Pre-Petition Secured Obligations mature on or before December 21, 2016.

**B.     Debtors' Urgent Need for Post-Petition Financing and Use of Cash Collateral**

16.     The DIP Facility is critical to the Debtors' ability to continue to operate and preserve the value of their assets through the pendency of a sale process.  As set forth in the First Day Declaration, the Debtors experienced significant liquidity issues immediately prior to the Petition Date, negatively impacting their businesses and straining relationships with critical vendors and suppliers.  The Debtors must have immediate access to Cash Collateral (as defined herein) and obtain post-petition financing to avoid a piecemeal liquidation of their assets to the detriment of their creditors and other parties-in-interest.

17.     In the ordinary course of business, the Debtors use cash on hand, cash generated by their operations, and borrowings under the Pre-Petition Revolving Facility to fund working capital, inventory purchases, capital expenditures and for other general corporate purposes.  An inability to access and use cash in the ordinary course of business during the Chapter 11 Cases could cripple the Debtors' business and impair the value of their estates. Indeed, the Debtors must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, manufactures, and customers, pay employees, and satisfy other working capital and operation needs, all of which are necessary to preserve and maintain the value of the Debtors' assets and, ultimately,

effectuate a successful sale of the Debtors' businesses.  Access to the DIP Facility and use of
Cash Collateral (as defined herein) will allow the Debtors to continue operating their businesses
while pursuing a sale of their assets to strategic investors.  After pursuing other avenues for
funding their continuing operations, the Debtors have determined that the DIP Facility is the
best financing option available.

18.      Leading up to the Petition Date, the Debtors worked with their legal and
financial advisors to formulate a plan that would provide the Debtors with sufficient liquidity to
continue their operations.  As of the Petition Date, however, the Debtors have determined in
their sound business judgment that without immediate access to the DIP Facility they will lack
sufficient liquidity to continue operating their businesses pending an orderly sale of their assets.
Accordingly, without the relief requested in the Motion, the Debtors would be required to
commence an immediate shutdown of their operations and piecemeal liquidation of their assets
to the detriment of their creditors, vendors, employees, and other stakeholders.

19.      However, if the Motion is approved, the DIP Facility will provide the
Debtors the liquidity that they need to continue to preserve the value of their estates pending the
sale of their assets pursuant to section 363 of the Bankruptcy Code.  Providing the Debtors with
the ability to continue their business operations through a sale with a competitive bidding
process, rather than a piecemeal liquidation, will maximize value for the Debtors' creditors,
vendors, employees, and other stakeholders.

C.      **The DIP Credit Agreement**

20.      Prior to the Petition Date, the Debtors and their legal and financial
advisors undertook an analysis of the Debtors' projected financing needs during the pendency
of these Chapter 11 Cases.  Based on such analysis, the Debtors determined that they could not
continue to operate solely on the use of "cash collateral," as that term is defined in section
363(a) of the Bankruptcy Code ("**Cash Collateral**"), and needed additional sources of working
capital and financing to operate their business and preserve the value of their assets during a
Chapter 11 sale process.  Accordingly, the Debtors' advisors' approached potential participants

in a debtor-in-possession financing arrangement.  Based on such efforts, the Debtors and their advisors determined that Salus was willing to provide post-petition financing and consent to the use of Cash Collateral on more favorable terms than any other reasonably available alternative.

21.    Accordingly, the Debtors began negotiating with Salus regarding the terms of a post-petition DIP Facility.  After a series of good faith, arms'-length negotiations, the Debtors entered into the DIP Credit Agreement[2] with the DIP Agent and DIP Lenders.  Pursuant to the DIP Credit Agreement, the DIP Secured Parties have agreed to, inter alia, provide the Debtors with the DIP Facility, subject to the DIP Financing Conditions (as defined herein), and the Pre-Petition Secured Parties have agreed to permit the Debtors to use the Cash Collateral in accordance with the terms of an approved budget (the "**Budget**")[3] during the pendency of the Chapter 11 Cases.  The DIP Facility provides for a revolving credit facility in the aggregate maximum amount of $49 million (the "**DIP Revolving Facility**"), composed of a (i) revolving $27 million tranche (the "**DIP Tranche A Revolver**"), and (ii) a revolving $22 million tranche (the "**DIP Tranche A-1 Revolver**").

22.    The DIP Facility is structured to address the Debtors' need for liquidity to continue to operate until they sell their assets and maximize the value of those assets for all of their stakeholders.  For instance, the DIP Tranche A-1 Revolver increases the Debtors' availability under the Pre-Petition Tranche A-1 Revolver by modifying certain components used to calculate the borrowing base in the Debtors' favor.  Additionally, the DIP Credit Agreement significantly reduces the Debtors' availability block under the Pre-Petition Credit Documents, thereby further increasing the Debtors' access to cash.  These provisions were rigorously negotiated by the Debtors and are essential to providing the Debtors necessary and immediate access to capital that will enable them to market and conduct an orderly sale of their assets.

---

[2]    A copy of the DIP Credit Agreement is attached to the Interim DIP Order as **Exhibit A**.

[3]    A copy of the Budget is attached to the Interim DIP Order as **Exhibit B**.

23.     As set forth below, approval of the DIP Facility, including the repayment of the Pre-Petition Obligations pursuant to the terms thereof, is essential to avoiding immediate and irreparable harm that would otherwise ensue from a piecemeal liquidation of the Debtors' assets.   Immediate access to Cash Collateral and post-financing will enable the Debtors to continue to operate, meet payroll obligations, and maintain business relationships with vendors, suppliers, and customers, which is necessary to preserve the value of their assets pending a sale. Moreover, entry of the Interim DIP Order will increase the Debtors' liquidity through the less restrictive borrowing base and reduced availability block provided for in the DIP Facility, which the Debtors, in their sound business judgment, believe will sustain their businesses as a going concern through the marketing and sale process.

24.     Accordingly, the Debtors request that the Court, among other things, (i) approve the terms of the DIP Credit Agreement (including the consensual use of Cash Collateral in accordance with the Budget); (ii) authorize the Debtors to execute and deliver the DIP Credit Agreement and all agreements, documents, and instruments contemplated by the DIP Credit Agreement and DIP Orders (collectively with the DIP Credit Agreement and DIP Orders, the "**DIP** **Documents**"), which shall be subject to the Court's approval at the Final Hearing; and (iii) grant adequate protection to the Pre-Petition Secured Parties as set forth in the Interim DIP Order.

**D.     Summary of DIP Credit Agreement**

25.     In accordance with the disclosure requirements of Bankruptcy Rule 4001(b), (c), and (d) and Local Rule 4001-4, the material terms of the DIP Credit Agreement are as follows:[4]

---

[4]     This summary is qualified in its entirety by the provisions of the DIP Credit Agreement. Capitalized terms used in this summary but not otherwise defined in the Motion shall have the meanings set forth in the DIP Credit Agreement.  To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern.

| Term or Provision | DIP Credit Agreement |
|---|---|
| **Borrowers**<br><br>*See Preamble.* | Kid Brands, Inc., as lead borrower, and Kids Line, LLC, Sassy, Inc., I&J Holdco, Inc., LaJobi, Inc. CoCaLo, Inc., and RB Trademark Holdco, LLC, each as a borrower. |
| **Guarantors**<br><br>*See Preamble.* | Future subsidiaries of Borrowers. |
| **DIP Lenders**<br><br>*See Preamble.* | Salus Capital Partners, LLC as Administrative Agent and Collateral Agent, Sterling National Bank, and each lender from time to time a party thereto. |
| **Commitments**<br><br>*See Sections 1.01 and 2.01.* | $49,000,000 in Aggregate Commitments.<br><br>Aggregate Commitments consists of (i) $27,000,000 in Aggregate Tranche A Commitments, and (ii) $22,000,000 in Aggregate Tranche A-1 Commitments. |
| **Availability Block**<br><br>*See Section 1.01.* | Closing Date to July 4, 2014 = $2,768,000.<br><br>July 5, 2014 to July 31, 2014 (so long as no Event of Default has occurred) = $2,000,000.<br><br>At all other times (so long as no Event of Default has occurred) = $500,000. |
| **Tranche A Borrowing Base**<br><br>*See Section 1.01, Definitions.* | The Tranche A Loans will be governed by a Tranche A Borrowing Base in an amount equal to without duplication: (i) the face amount of Eligible Trade Receivables, net of Receivables Reserves, multiplied by 95%, <u>plus</u> (ii) the lesser of (i) the Inventory Advance Rate 68% multiplied by the Cost of Eligible Inventory, net of Inventory Reserves, and (ii) the Cost of Eligible Inventory, net of Inventory Reserves multiplied by the Appraisal Percentage 100% multiplied by the Appraised Value applicable to Eligible Inventory, <u>minus</u> (iii) the Availability Block, <u>minus</u> (iv) the then amount of all Availability Reserves. |
| **Tranche A-1 Borrowing Base**<br><br>*See Section 1.01, Definitions.* | The Tranche A Loans will be governed by a Tranche A Borrowing Base in an amount equal to the lesser of (i) the Appraised Value of the Eligible Intellectual Property, net of Intellectual Property Reserves, multiplied by the Intellectual Property Advance Rate 62%, and (ii) the Aggregate Tranche A-1 Commitments at such time. |

| | |
|---|---|
| **Interest Rate**<br><br>*See Sections 1.01 and 2.08.* | Adjusted LIBO Rate plus (i) 10% per annum with respect to Tranche A Loans, and (ii) 15% per annum with respect to Tranche A-1 Loans. |
| **Default Rate**<br><br>*See Section 1.01, Definitions.* | Plus 3.5% per annum with respect to the Tranche A Loans and Tranche A-1 Loans. |
| **Fees**<br><br>*See Section 2.09.* | **Commitment Fee**: 0.5% times the average daily amount by which the Tranche A Commitments exceed the outstanding amount of the Tranche A Loans, and 0.5% times the average daily amount by which the Tranche A-1 Commitments exceed the outstanding amount of the Tranche A-1 Loans.<br><br>**Collateral Monitoring Fee**: $25,000 per month paid on the Closing Date and on the first day of each month thereafter until the later of (i) the Maturity Date, and (ii) for so long as any obligations remain outstanding under the Agreement.<br><br>**DIP Exit Fee**: 2.5% of the Aggregate Commitments as of the Closing Date, or $1,225,000, payable on the earliest to occur of a (i) sale of substantially all of the assets, (ii) confirmation in the Chapter 11 Case of a plan of reorganization or liquidation, or (iii) the Termination Date. |
| **Security**<br><br>*See Preamble and Section 5.27.* | The DIP Facility is secured by the DIP Lenders' security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral and entitled to super priority administrative status under the Bankruptcy Code. |
| **Carve-Outs**<br><br>*See Sections 1.01 and 5.28.* | The following expenses are considered "Carve-Outs":<br>• All fees required to be paid to the Clerk of the Bankruptcy Court and to U.S. Trustee, and<br>• For allowed fees and expenses of Case Professionals, (a) $400,000 (which is being deposited into the Professional Fee Escrow Account on the Closing Date in accordance with the Budget) and (b) an amount equal to $200,000 per week, which shall be funded into the Professional Fee Escrow Account on Wednesday of each week (or such other day of the week selected by the Debtors) pursuant to the Budget; provided that (x) the Debtors have sufficient Availability on such date, (y) the Termination Date has not occurred, and (z) |

| | |
|---|---|
| | no Event of Default has occurred and is continuing. |
| **Use of Proceeds**<br><br>*See Section 6.11.* | Borrowings under the DIP Facility may be used (i) to repay Indebtedness owed in connection with the Pre-Petition Credit Agreement, (ii) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business, (iii) to Cash Collateralize the Outstanding Amount of L/C Obligations with respect to Letters of Credit (including the Existing Letters of Credit), and (iv) for general corporate purposes of the Loan Parties, in each case to the extent permitted under applicable Law, the Approved Budget and the Loan Documents, including post-petition operating expenses set forth in the Approved Budget and other expenses arising in the Chapter 11 Cases as may be approved by the Bankruptcy Court and the DIP Agent. |
| **Maturity Date**<br><br>*See Section 1.01.* | June 15, 2015. |
| **Events of Default**<br><br>*See Section 8.01.* | Events of default under the DIP Facility are identified in Section 8.01 of the DIP Credit Agreement. |
| **Conditions Precedent to Credit Extensions**<br><br>*See Sections 4.01, 4.02, and 6.23.* | Conditions precedent to the Initial Credit Extension and all Credit Extensions are set forth in Sections 4.01 and 4.02, respectively, and include the retention of a chief restructuring officer acceptable to Salus at the Loan Parties' expense and pursuant to an agreement reasonably acceptable to Salus. |
| **Financial Covenants**<br><br>*See Section 7.18.* | Permit the results in the Approved Budget Variance Report to vary by more than five percent (5%) from the results projected in the applicable Approved Budget with respect to the Cumulative Four Week Period and the Cumulative Period (except to the extent such actual results are more favorable) as to the following: disbursements, cash-on-hand, professional fees (excluding the Agent's professional fees) and expenses, Availability and aggregate Outstanding Amount of the Loans; provided, that disbursements and Availability shall be tested by Cumulative Period beginning with the conclusion of the second Cumulative Period, which at the conclusion thereof, cumulative disbursements and Availability must be within a 20% variance and the allowed |

| | |
|---|---|
| | variance shall be (a) 15% at the conclusion of the third Cumulative Period, (b) 10% at the conclusion of fourth Cumulative Period and (c) 5% at all times thereafter, with respect to the Cumulative Four Week Period and the Cumulative Period. |
| **Indemnification**<br><br>*See Section 10.04.* | The Loan Parties agree to indemnify the DIP Lenders as set forth in the Section 10.04 of the DIP Credit Facility. |
| **Release**<br><br>*See Section 2.15.* | The DIP Facility provides general releases in favor of the DIP Lenders. |
| **Bankruptcy Milestones**<br><br>*See Section 6.26.* | **Binding Asset Purchase Agreement**:<br><ul><li>No later than **July 3, 2014**, the Loan Parties shall enter into an asset purchase agreement to sell substantially all of the assets of the Borrower to stalking horse bidder.</li></ul><br>**Sale and Bidding Procedures**:<br><ul><li>Filing of sale and bidding procedures motion under Section 363 of Bankruptcy Code shall be filed on or before **July 9, 2014**.</li><li>Bankruptcy Court must hold hearing regarding bidding procedures and enter an order approving bidding procedures on or before **July 24, 2014**.</li></ul><br>**Winning Bidder, Sale**:<br><ul><li>Winning bidder shall be chosen no later than **July 31, 2014**.</li><li>The Bankruptcy Court must enter the Asset Sale Order no later than **August 5, 2014**.</li><li>Sale must be consummated and the Obligations paid in full and all commitments to lend terminated on or before **August 8, 2014**.</li></ul> |

**E.      Additional Provisions to Be Highlighted Under Local Rule 4001-4**

26.      In addition to the material terms discussed above, the Debtors have identified the below provisions of the Interim DIP Order that are required to be highlighted pursuant to Local Rule 4001-4:

(i)     *Rollup*.  The DIP Credit Agreement contemplates the roll-up of the Pre-Petition Obligations under the Pre-Petition Revolving Facility into the DIP Revolving Facility after entry of the Interim DIP Order.  *See* Interim DIP Order at ¶ F(iv).

(ii)    *Waivers and Concessions as to Validity of Pre-Petition Debt*.  Per the Interim DIP Order, the Debtors stipulate to the amount, nature and extent of the Pre-Petition Secured Parties' liens and security interests with respect thereto.  *See* Interim DIP Order at ¶ E(iii).

(iii)   *Committee Challenge Period*.  Per the Interim DIP Order, any committee of unsecured creditors shall have 60 days from the date the committee is formed (or, if no committee is formed, parties-in-interest with appropriate standing shall have 75 days from the entry of the Interim DIP Order) to challenge the Pre-Petition Secured Parties' liens and security interests under the Pre-Petition Credit Documents.  *See* Interim DIP Order at ¶ 35.

(iv)    *Bankruptcy Code Section 506(c) Waiver*.  The Interim DIP Order provides for a waiver of claims under section 506(c) of the Bankruptcy Code upon the entry of the Final DIP Order.  *See* Interim DIP Order at ¶ 38.

(v)     *Liens on Avoidance Actions*.  The definition of the DIP Collateral under the Interim DIP Order includes all causes of action or proceeds thereof, including avoidance actions, upon entry of the Final DIP Order.  *See* Interim DIP Order at ¶ 6(a)(xv).

(vi)    *Termination, Default, Remedies*.  Per the Interim DIP Order, a termination event occurs upon the occurrence of an event of default under the DIP Credit Agreement.  *See* Interim DIP Order at ¶¶ 25, 26.

### **Relief Requested**

27.     By this Motion, the Debtors seek the entry of the DIP Orders granting the following relief:

(i)     authorizing the Debtors to enter into the DIP Credit Agreement and obtain senior secured, superpriority post-petition $49 million revolving credit facility consisting of the roll-up of the existing obligations under the Pre-Petition Revolving Facility and composed of a (i) revolving $27 million DIP Tranche A Revolver, and (ii) a $22 million DIP Tranche A-1 Revolver, subject to (x) the entry of a Final DIP Order satisfactory to the DIP Agent, (y) the execution and delivery of DIP Documents in form and substance satisfactory to the DIP Agent, and (z) the satisfaction of the terms and conditions set forth in the DIP Documents (collectively, the "**DIP Financing Conditions**");

(ii) authorizing the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Documents, all of which shall be subject to the Court's approval at the Final Hearing;

(iii) subject to the satisfaction of the DIP Financing Conditions, authorizing the Debtors to enter into the DIP Facility and incur any and all obligations owing thereunder and under the DIP Documents from time to time (collectively, the "**DIP Obligations**") and to grant to the DIP Agent allowed superpriority administrative expense claim status in the Chapter 11 Cases and any Successor Case (as defined herein) and authorizing the Debtors to grant to the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim DIP Order), in each case subject to the priorities set forth in the Final DIP Order;

(iv) authorizing the Borrowers' use of Cash Collateral of the Pre-Petition Secured Parties;

(v) providing adequate protection to the Pre-Petition Secured Parties as set forth in the Interim DIP Order;

(vi) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and, subject to the satisfaction of the DIP Financing Conditions, the DIP Documents;

(vii) scheduling a Final Hearing to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

(viii) granting related relief.

## BASIS FOR RELIEF REQUESTED

**A.     The Debtors Should Be Authorized to Obtain Post-Petition Financing**

**(i)     Entering into the DIP Credit Agreement and the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

28.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining secured or superpriority financing pursuant to section 364 of the Bankruptcy Code. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Intl AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because

such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.,* Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a Debtors' business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a Debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray v. Shenandoah Fed. Say. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

29.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code.") (citation omitted).

30.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) of the Bankruptcy Code authorized, after notice and a hearing,

upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

31.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their legal and financial advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases.  Based on that analysis, the Debtors determined that post-petition DIP financing is immediately necessary to preserve the value of their estates in these Chapter 11 Cases while the Debtors conduct a sale of their assets. Accordingly, the Debtors began negotiating with the Pre-Petition Secured Parties regarding the terms of the post-petition DIP Facility.  After a series of good faith, arms'-length negotiations, the Debtors and the DIP Secured Parties entered into the DIP Credit Agreement, thereby reaching agreement on the material terms of the DIP Facility (subject to the DIP Financing Conditions).  Based on the advice of counsel and financial professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  Without post-petition financing, the Debtors would not be able to preserve the value of their assets or continue operations until they are able to sell their assets pursuant to section 363 of the Bankruptcy Code.  The Debtors' advisors have approached potential parties to participate in the debtors-in-possession financing and their advisors have assisted the Debtors in negotiations to obtain the best terms available.  However, for a number of reasons, including but not limited to the existence of liens granted to the Pre-Petition Secured Parties, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.  Moreover, as noted, virtually all of the Debtors' assets are encumbered by Pre-Petition Liens.  Thus, even if

alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in the time required to address the Debtors' immediate liquidity needs, such a financing would result in a protracted priming contest with the Pre-Petition Secured Parties, the results of which could not be predicted with certainty.  Such potential protracted litigation would jeopardize the Chapter 11 Cases from the outset and possibly result in the immediate piecemeal liquidation of the Debtors' assets and reduced recoveries for the Debtors' creditors.  By contrast, no priming contest will result under the proposed DIP Facility because the DIP Agent will be priming its own Pre-Petition Liens on a fully consensual basis.

32.    Therefore, pursuant to the terms of the DIP Credit Agreement, the DIP Facility will provide the Debtors with funds that the Debtors and their advisors have determined should be sufficient to solidify their credit-worthiness to their vendors and support the Debtors' ongoing operations during the Chapter 11 Cases and their sale process.

**(ii)    The Debtors Should Be Authorized to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis**

33.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, post-petition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

34.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to

the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores,* 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) of the Bankruptcy Code where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

35.     The Debtors' advisors' discussions with various potential sources of debtor-in-possession financing revealed that financing on a junior or unsecured basis was unavailable. Accordingly, the Court should (i) authorize the Debtors to grant to the DIP Agent senior liens on the Debtors' unencumbered property, pursuant to section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than prior permitted encumbrances under the Pre-Petition Credit Documents) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) grant the DIP Obligations superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code, subject, in each instance, to the Carve Out (as defined in the Interim DIP Order).

36.    Because the DIP Facility also contemplates the granting of priming liens to the DIP Agent (subject to the Carve-Out and other Permitted Liens), the DIP Facility also is subject to approval under the requirements of section 364(d) Bankruptcy Code.   Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)    the trustee is unable to obtain such credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Because both of these conditions are satisfied, the Debtors submit that the Court should grant the DIP Agent senior liens and security interests as provided in the Interim DIP Order.

37.    First, as discussed above, section 364(d)(1)(A) of the Bankruptcy Code is satisfied because the Debtors are unable to obtain credit sufficient to sustain their day-to-day business operations or maintain the value of their assets through a sale process other than by the granting to the DIP Agent a first priority lien and security interest in the Debtors' assets as provided in the Interim DIP Order.   Moreover, the Debtors negotiated the DIP Credit Agreement at arm's-length and have determined, in the exercise of their business judgment and in consultation with their legal and financial advisors, that such financing is the best and only viable financing available under the circumstances.   Bankruptcy Courts grant a debtor considerable deference in acting in accordance with its business judgment.   See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

38.    <u>Second</u>, section 364(d)(1)(B) of the Bankruptcy Code is satisfied because the Debtors propose to provide adequate protection to the Pre-Petition Secured Parties in the manner set forth above.  Moreover, the Pre-Petition Secured Parties are the same as the DIP Secured Parties and support and consent to the proposed DIP Facility in its entirety.

39.    For these reasons, the Debtors submit that the conditions set forth in sections 364(c) and 364(d) of the Bankruptcy Code are satisfied and that the circumstances of these Chapter 11 Cases warrant approval the DIP Facility.  The Debtors further submit that the terms of the DIP Facility and the DIP Orders are fair, reasonable, and necessary under the circumstances, and should be approved in their entirety.

**B.    The Debtors' Request To Use the Pre-Petition Secured Parties' Cash Collateral, Pursuant to the Terms of the DIP Orders, Should Be Approved**

40.    The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

41.    Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Section 363(e) of the Bankruptcy Code requires a debtor to adequately protect its secured creditors' interest in property to be used by the debtor against any diminution in value of such creditors' interest resulting from the debtor's use of the property.

42.    What constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see*

*also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996); *In re Sw.Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).   The purpose of

adequate protection is to shield a secured creditor from diminution in the value of its interest in

the particular collateral during the period of use.   *See In re 495 Cent. Park Ave. Corp.*, 136 B.R.

626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y.

1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).   Adequate

protection can come in various forms, including payment of adequate protection fees, payment

of interest, and granting of replacement liens and administrative claims.

43.   As discussed above and as set forth in detail in the Interim DIP Order, the

Debtors propose to provide the Pre-Petition Secured Parties, with three primary forms of

adequate protection to the extent of any diminution in value of their respective interests in the

Pre-Petition Collateral (including the Cash Collateral) resulting from the Debtors' use, sale, or

lease of the Pre-Petition Collateral (including the Cash Collateral) during the Chapter 11 Cases

and the imposition of the automatic stay.

44.   <u>First</u>, the Debtors will provide the Pre-Petition Secured Parties with

adequate protection replacement liens in all Pre-Petition Collateral (subject to certain Permitted

Liens and the Carve-Out), which includes, without limitation, any and all property of the

Debtors, to the extent of and diminution in the value of the Pre-Petition Collateral.   <u>Second</u>,

subject to certain Permitted Liens and the Carve-Out, as further protection against any

diminution in the value of the Pre-Petition Secured Parties' interest in the Pre-Petition

Collateral, the Pre-Petition Secured Parties shall be granted the superpriority claims against the

Debtors to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.   <u>Third</u>,

the Debtors will provide the Pre-Petition Secured Parties with payment of reasonable

professional fees and expenses, subject to the limitations set forth in the DIP Documents and

Budget.

45.   In light of the foregoing, the Debtors submit, and the Pre-Petition Secured

Parties agree, that the foregoing forms of proposed adequate protection for the benefit of the

Pre-Petition Secured Parties are necessary and appropriate under the circumstances of the Chapter 11 Cases to ensure that the Debtors are able to continue using Cash Collateral. Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.  Moreover, courts in this Circuit have granted similar relief in other recent chapter 11 cases.  *See, e.g.*, *In re Dots, LLC, et al.*, Case No. 14-11016 (DHS) (Bankr. D. N.J. Feb. 18, 2014); *In re 155 Route 10 Assocs., Inc., et al.*, Case No. 12-24414 (NLW) (Bankr. D. N.J. June 5, 2012); *In re Marcal Paper Mills, Inc.*, No. 06-21886 (MS) (Bankr. D. N.J. Dec. 4, 2006); *In re Neb. Book Co.*, Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); *In re Barnes Bay Development, Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010); *In re Masonite Corp.*, Case No. 09-10844 (PJW) (Bankr. D. Del, Mar. 17, 2009); *In re Monaco Coach Corp.*, Case No. 09-10750 (KJC) (Bankr. D. Del. Mar. 10, 2009); *In re Spansion Inc.*, Case No. 09-10690 (KJC) (Bankr. D. Del. Mar. 4, 2009); *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009); *In re Hawaiian Telcom Commc'ns, Inc.*, Case No. 08-13086 (PJW) (Bankr. D. Del. Dec. 3, 2008).

**C.      Request for Entry of Interim DIP Order**

46.      Bankruptcy Rule 4001(b) and (c) provides that a final hearing on a motion to use Cash Collateral or obtain credit may not be commenced earlier than 14 days after service of such motion.  However, the Court is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the obtaining of credit or use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.

47.      The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to the confidence of the Debtors' employees, vendors, and customers and to the preservation and maintenance of the value of the Debtors'

estates.  As discussed above, the Debtors require immediate access to Cash Collateral in order to meet their liquidity needs in connection with these Chapter 11 Cases.  While the Interim DIP Order also approves the Debtors' authorization to enter into the DIP Credit Agreement, the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral.  The Pre-Petition Secured Parties were unwilling to consent to the Debtors' use of Cash Collateral absent the Debtors' agreement to and the Court's approval of the DIP Credit Agreement in its entirety.  Accordingly, the Debtors seek immediate entry of the Interim DIP Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

**D.     Modification of the Automatic Stay**

48.     The DIP Facility contemplates a modification of the automatic stay, to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders. Provisions of this kind are standard in debtor-in-possession financings and are reasonable under the circumstances of these Chapter 11 Cases.

**E.     Payment of the Pre-Petition Secured Obligations Should Be Approved**

49.     The Debtors submit that the DIP Facility represents the best post-petition financing available to the Debtors under the circumstances and that entry into the DIP Credit Agreement is in the best interests of the Debtors and their estates.  Substantially all of the Debtors' assets are encumbered by the liens and security interests securing the Debtors' Pre-Petition Secured Obligations.  None of the potential lenders approached by the Debtors were willing to extend credit on a junior priority or unsecured basis.  Thus, absent payment in full of the Pre-Petition Secured Obligations, the Debtors would be required to attempt to prime the liens of the Pre-Petition Secured Parties.  Even if the Debtors had been able to locate a debtor-in-possession lender willing to provide a priming facility, the Debtors would have risked further harm to their business if they had chosen to engage in expensive, time-consuming, and uncertain litigation.

50.     Moreover, as set forth above, the Debtors engaged in good-faith, arms' length negotiations with the DIP Agent prior to determining that it was in their best interests to enter into the DIP Credit Agreement.  Given the Debtors' immediate liquidity needs, the DIP Agent's ability to act quickly was a significant factor in the Debtors' determination.

51.     Finally, repayment of the debt owed to the Pre-Petition Secured Parties will not prejudice other creditors because the Interim DIP Order provides that the approval of the DIP Facility is without prejudice to the right of any official committee appointed in the Chapter 11 Cases (or, if none, parties-in-interest) to contest or challenge the validity of the Pre-Petition Secured Parties' liens.  Interim DIP Order, ¶ 35.  For the foregoing reasons, the Debtors respectfully submit that the repayment of the Pre-Petition Secured Obligations is appropriate in light of the circumstances of the Chapter 11 Cases.

52.     Courts routinely approve debtor-in-possession financing facilities that provide for the repayment of pre-petition indebtedness owed pursuant to secured pre-petition revolving and/or term loan credit facilities.  *See, e.g.*, *In re Dots, LLC, et al.*, Case No. 14-11016 (DHS) (Bankr. D. N.J. Feb. 18, 2014); *In re Mantara, LLC*, Case No. 13-13370 (Bankr. S.D.N.Y. Oct. 24, 2013); *In re NE Opco, Inc.*, Case No. 13-11483 (Bankr. D. Del. Jun. 11, 2013); *In re Big M, Inc.*, Case No. 13-10233 (DHS) (Bankr. D.N.J. Jan. 8, 2013); *In re SSI Group Holding, Inc.*, Case No. 11-12917 (MFW) (Bankr. D. Del. Sept. 15, 2011) (interim order); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 11, 2008); *In re Sharper Image Corporation*, Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008).

## REQUEST FOR FINAL HEARING

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the entry of the Interim DIP Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

### WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

54.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### WAIVER OF MEMORANDUM OF LAW

55.     Because the legal points and authorities upon which this Motion relies are incorporated herein and do not raise any novel issues of law, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law pursuant to Local Rule 9013-2 be deemed waived.

### NO PRIOR REQUEST

56.     No previous motion for the relief sought herein has been made to this or to any other court.

### NOTICE

57.     Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) the Debtors' consolidated thirty largest unsecured creditors; (iii) counsel for the Pre-Petition Lender and DIP Lender, c/o Choate, Hall & Stewart LLP, Attn: John F. Ventola, Esq., Two International Place, Boston, MA 02110; (iv) those parties listed on the Debtors' Core Service List; and (v) those parties who have filed a notice of appearance and request for service of pleadings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**WHEREFORE,** the Debtors respectfully request that this Court: (i) enter the Interim DIP Order, (ii) schedule the Final Hearing to consider entry of the Final DIP Order, and (iii) grant the Debtors such other and further relief as the Court deems just and proper.

Dated: June 18, 2014                    Respectfully submitted,

                                          **LOWENSTEIN SANDLER LLP**

                                          /s/  *S. Jason Teele*
                                          Kenneth A. Rosen, Esq.
                                          Steven M. Skolnick, Esq.
                                          S. Jason Teele, Esq.
                                          Nicole Stefanelli, Esq.
                                          Shirley Dai, Esq.
                                          Anthony De Leo, Esq.
                                          65 Livingston Avenue
                                          Roseland, New Jersey 07068
                                          (973) 597-2500 (Telephone)
                                          (973) 597-2400 (Facsimile)

                                          *Proposed Counsel to the Debtors and*
                                          *Debtors-in-Possession*